**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:16-CR-154-WSD-AJB** |
| **ALAN ALBERT TRIPPS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**UNITED STATES MAGISTRATE JUDGE'S
FINAL REPORT AND RECOMMENDATION**

Defendant Alan Albert Tripps ("Tripps" or "Defendant") moves to suppress from his trial a quantity of cocaine and a firearm seized following a traffic stop of the vehicle he was driving and statements that he made after he was arrested. [Docs. 20, 34]. The Court held an evidentiary hearing, [Doc. 37 ("T_")], after which the parties filed briefs. [Docs. 38 (Govt.), 41 (Tripps), 42 (Govt.)]. For the following reasons, the Court **RECOMMENDS** that the motion to suppress evidence, [Doc. 20], be **DENIED** and that the motion to suppress statements, [Doc. 34], be **GRANTED**, but that any post-arrest, pre-*Miranda* statements elicited from Tripps be deemed voluntary if the Government seeks to use them to impeach Defendant's trial testimony.

## I.  Facts

The evidentiary record reveals that on January 7, 2016, at approximately 5:25 p.m.,[1] Marietta Police Department ("MPD") Officer Washington[2] was on routine patrol at North Marietta Parkway and Cobb Parkway in the City of Marietta when he saw a silver Jetta driven by Tripps make an illegal U-turn.  T11-12, 22.  Washington stopped the vehicle.  *Id.*  The subsequent encounter was video- and (partially) audio-recorded.  Govt. Ex. 1 ("DVD") at 02:43.  Washington approached the driver's side door (the driver's window was down), and as he did, he smelled a combination of burnt and fresh marijuana.  T12, 45.  He asked Tripps for his driver's license, but Tripps stated that he did not have it on him.  T12, 24.  After obtaining Tripps's name and date of birth, Washington returned to his patrol vehicle, ran a GCIC check and discovered that Tripps's driver's license was suspended, and then he confirmed the suspension through his dispatch.  T12-13, 26; DVD at 06:45; 08:53.  The license suspension was

---

[1]     It was still daylight at the time of the traffic stop.  T23; Govt. Ex. 1.

[2]     Washington had been a police officer for one and a half years at the time of the traffic stop in this case.  T8, 22.  His training in smelling marijuana was limited to accompanying the MPD Drug Interdiction Unit on patrols and, through those endeavors, being introduced to the odors of various types of drugs.  T20-21.  He testified that, through this training and experience as a patrol officer, he was able to identify the smell of burnt and unburnt marijuana, and that he had smelled marijuana hundreds of times and seized it around one hundred times.  T21, 44.

based on Tripps's failures to pay child support and to appear in court and thus, pursuant to MPD policy, Washington was going to arrest Tripps for the driving-on-a-suspended-license ("DOSL") offense.  T28; DVD at 12:04.

Once MPD Officers Staso and McNeal arrived a few minutes later to provide backup for Washington, DVD at 09:04, Washington re-approached the Jetta and told Tripps to exit the vehicle.  T14, 25; DVD 09:17.  Tripps told Washington that he had placed his legal handgun on the dashboard so that Washington could see it, and Washington saw the weapon at that time.  T14, 20, 26-27, 47-48.  Washington handcuffed Tripps and told him that he was under arrest for DOSL.  T14, 16; DVD at 09:24.  As Tripps was getting out of the Jetta, Washington saw an extended handgun magazine on the floorboard.  T14.  Once Tripps was removed from the Jetta, McNeal approached the passenger side window and spoke with the passenger and owner of the Jetta, Ms. Hernandez.  T15, 45-46; DVD at 09:24.

Washington searched Tripps incident to arrest and removed $623 in currency from him.  T14, 37; DVD at 10:45; *see also* DVD at 11:24 (Staso counting currency in front of Washington's dash cam); *id*. at 12:27 (Staso calling the currency out as $638).  Washington asked Tripps what he did for a living and Tripps stated that he worked in a warehouse as a forklift driver.  DVD at 11:28.  Tripps stated that the currency was

3

from his paycheck and pleaded with Washington not to take the currency because he needed the money to pay his bills. DVD at 11:45. Washington placed the still-handcuffed Tripps in the rear of the patrol car. T14; DVD at 13:22.[3] Washington told Tripps that everything he stated was being recorded. DVD at 12:58.

McNeal told Washington that she did not smell marijuana emanating from the Jetta. T15, 32. Washington spoke to Hernandez and questioned her about Tripps's livelihood, and she stated that he worked at a restaurant and assisted others with some sort of a record label. T17, 40.

Washington then returned to Tripps and again asked him what he did for a living. DVD at 17:10.[4] Washington told Tripps that Hernandez had stated two other places of

---

[3]    The DVD exhibits a split screen image of the Jetta parked in front of Washington's patrol car and the middle portion of the rear seat of the patrol car. Once placed in the vehicle, Tripps is visible only occasionally because he mainly was sitting out of camera range, but all of his statements are generally audible on the recording.

[4]    The Government announced at the evidentiary hearing that it was not seeking to introduce any of Tripps's post-arrest statements in its case-in-chief, but that it sought a ruling from the Court that Tripps's post-arrest pre-*Miranda* statements were voluntarily made, so that they could be used for impeachment if he testified at trial. T6-7. The Court instructed the Government in its post-evidentiary hearing filings to identify, by their digital marks on Govt. Ex. 1, which particular statements by Tripps the Government wanted to use for impeachment purposes, so that the Court could make a determination whether those statements were voluntarily obtained. T7. Instead, the Government outlined in its post-hearing brief the statements that it seeks to use to impeach Tripps if he testified at trial, citing to the hearing transcript and approximate

4

business, and that in combination with the currency on Tripps's person and the smell of marijuana, he (Washington) was suspicious.  DVD at 17:30.  Tripps denied current gang association.  DVD at 18:14.

Tripps and Hernandez both denied consent to search the vehicle.  T33-34.

In questioning Tripps after he was arrested, Washington did not *Mirandize* him. However, neither Washington or any other officer who questioned Tripps threatened him, made any promises to him, or pointed weapons at him.  Tripps did not appear to Washington to be under the influence of drugs or alcohol or to be suffering from a mental disability.  T17-18, 24.  Tripps also called Washington or other officers over to

_____

real-time references on the DVD.  [*See* Doc. 38 at 4-5 (noting that "at about 5:33," Washington asked Tripps what he did for work, and Tripps stated that he was a forklift driver (citing T17, 36-37, 40 & Govt. Ex. 1); Washington asked Tripps how he knew the female in the Jetta, and Tripps stated that she was his girlfriend and that they had been dating for a while, (citing T38, 40-41 & Govt. Ex. 1); at approximately 5:40 p.m., Washington returned to his patrol car and confronted Tripps about the fact that Hernandez had said that he worked different places than Tripps had said, (citing Govt. Ex. 1); Tripps mentioned that he worked two jobs, and identified a second place of employment other than where he worked as a forklift driver, (citing *id.*); Washington asked Tripps whether he was associated with any gangs and Tripps responded that he used to be a "GD" [Gangster Disciples] a long time ago (citing *id.*); Washington asked Tripps whether he had been a GD in Georgia, and Tripps denied that he was and explained that he had been involved in Louisiana, but that he knew some folks in Georgia, (citing *id.*)].

the patrol car several times, T18, but mostly to request that he be allowed to sit on the curb or have the door to the patrol car open.  *See*, *e.g.*, DVD at 25:00.

To confirm his suspicions about the marijuana odor, Washington called for a drug-detecting canine.  T15.  Washington told Hernandez to get out of the vehicle in anticipation of the arrival of the canine.  T16; DVD at 13:55.  Hernandez's coat was retrieved for her out of the Jetta.  DVD at 15:39.  Washington entered the Jetta, retrieved the weapon, and handed it to Staso.  DVD at 15:58-16:03.  The canine handler and his dog arrived ten to twelve minutes after Hernandez exited the Jetta.  T17, 35; DVD at 24:28.

When MPD Officer Figueroa and his canine, Atos, arrived, Washington told Figueroa of the circumstances surrounding the encounter.[5]  Figueroa deployed Atos to perform an open-air sniff around the vehicle and Atos alerted on the Jetta's rear passenger door and trunk, indicating the presence of narcotics.  T18-19, 57-60; DVD at 26:13, 26:45.  After Figueroa told Washington about Atos's positive alert, Washington and Figueroa searched the vehicle and located a grey zipped shaving bag in the backseat that contained .01 grams of  marijuana, a pipe, a quantity of cocaine, a

---

[5]      Figueroa inspected the vehicle before deploying Atos, in order to determine if there was anything in the vehicle that could harm Atos.  During this inspection, Figueroa detected a faint order of marijuana.  T58.

6

marijuana grinder, other drug paraphernalia, and multiple scales, including a digital one.  T19, 48-49, 68-69.[6]

---

[6]     In his post-evidentiary hearing brief, Tripps did not contest either the qualifications or reliability of Atos's drug-detecting skills or Figueroa's ability as a dog handler.  [*See* Doc. 41, *passim*].  As a result, this issue does not merit in-depth discussion.  Here, the evidence presented demonstrates that Figueroa was a certified dog handler and canine instructor.  T50.  He held certifications from the National Narcotic Detector Dog Association ("NNDDA") and the North American Police Working Dog Association ("NAPWDA").  T51.  In nine years working with four different dogs, Figueroa has conducted no less than one thousand open-air sniffs.  *Id.*

Atos, a three-year old Belgian Malinois, underwent an eight-week training course with Figueroa and was trained to detect marijuana, cocaine, heroin, and methamphetamine, and was also trained to locate people.  T52, 61.  He was certified through NNDDA and NAPWDA.  *Id.*  Atos undergoes weekly training in finding narcotics and persons, including "blind hides" and working in buildings.  T53-54.  Thus, the Court concludes that Atos was a properly certified and trained drug-detecting canine.

Once a trained canine gives a positive alert to a vehicle, probable cause exists to search that vehicle.  *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006) ("We have long recognized that probable cause arises when a drug-trained canine alerts to drugs." (internal quotation marks omitted)); *see also United States v. Burrows*, 564 Fed. Appx. 486, 492 (11th Cir. May 1, 2014) ("[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  (quoting *Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013)).  Therefore, Atos's alert provided probable cause to believe that narcotics were located inside the Jetta.  Then, under the so-called "automobile exception" to the Fourth Amendment's preference for warrants, the police can conduct a warrantless search of a vehicle "if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search."  *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007).  "The requirement of mobility is satisfied merely if the automobile is operational."  *Id.* (internal quotation marks omitted).  In searching the vehicle, law enforcement is

AO 72A
(Rev.8/8
2)

Washington went back to Tripps, and asked why he did not previously tell him about the drugs.  T20; DVD at 34:58.  Washington advised Tripps that Hernandez stated that the drugs were his.  DVD at 35:04.  Tripps is heard on the recording stating repeatedly that there was no "coke or heroin in that car."  DVD at 35:22-40. Washington recited *Miranda* warnings to Tripps.  DVD at 36:14.  Tripps kept stating that he wanted to see the drugs, and Washington stated that he would show them to him if he told him whether or not he was going to speak with him.  DVD at 36:40.  The DVD captured Tripps repeatedly denying knowledge of the drugs, even though the police were not present or questioning him.  *See, e.g.,* DVD at 43:16.  Washington took Tripps out of the car, searched him again and asked him if he was a convicted felon, which Tripps denied.  DVD at 48:56.  Washington and other officers continued to engage Tripps in questioning, but Tripps generally denied knowledge of the drugs and specifically denied that his fingerprints would be on the bag containing the drugs. DVD at 49:45, 58:59, 59:30-1:04:33.

---

permitted to "search all parts of the vehicle, and any containers therein, where the object of the search might be found."  *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014).  As a result, the grey zipped bag was properly opened and searched.

## II.    Arguments of the Parties

The Government argues that Washington had probable cause to stop the Jetta upon observing the illegal U-turn, and probable cause to arrest Tripps for DOSL.  [Doc. 38 at 9].  It argues that the Court should reject Tripps's argument that he was unlawfully detained pending the canine unit's arrival because he already was properly under arrest for DOSL, and so the traffic stop was not prolonged— and Tripps was not detained— to investigate the suspected drug offense.  [*Id.* at 9-10].

The Government alternatively argues that Washington had reasonable suspicion to extend the traffic stop beyond the U-turn/DOSL investigation because he smelled marijuana.  [*Id.* at 10].  It submits that although McNeal did not smell marijuana, she approached the vehicle several minutes later after the Jetta's windows had been open and Tripps had been removed from the car, thus making it reasonable that she could not detect the odor.  The Government also notes that Figueroa reported that he smelled marijuana.[7]  [*Id.* at 10].

---

[7]    The Government further contends that the officers ultimately discovered a trace amount of marijuana on a grinder, suggesting that previously there may have been greater amounts of marijuana in the vehicle, and that, therefore, explains the smell of marijuana detected by Washington and Figueroa despite the trace amount of marijuana ultimately located.  [Doc. 38 at 10].  This argument is rejected out of hand. The Government must know that the courts have long rejected the proposition that a search invalidated at its inception may be validated by what it turns up.  *Wong Sun v.*

9

The Government next argues that it submitted sufficient evidence of Atos's training and reliability such that his positive alert for the presence of narcotics constituted probable cause to search the Jetta.  [*Id.* at 11].

As to Tripps's statements, the Government acknowledges that he made several statements in response to custodial questioning before he was read his *Miranda* warnings, i.e., where he worked, where he made the money found on his person, whether he had ingested any drugs that day, his relationship with Hernandez, and his gang associations, as well as his request to see the drugs in response to Washington's question why Tripps did not tell him earlier about the drugs.  [*Id.* at 12].  The Government then contends that at that point Washington advised Tripps of his *Miranda* rights and that Tripps waived those rights.  [*Id.*].  It states that it has no intention of introducing Tripps' post-arrest, pre-*Miranda* statements, but seeks from the Court a ruling that these statements were made voluntarily because they were not coerced, no

---

*United States*, 371 U.S. 471, 415 (1963); *United States v. Di Re*, 332 U.S. 581, 595 (1948) ("We have had frequent occasion to point out that a search is not to be made legal by what it turns up.") (footnote and citation omitted); *Byars v. United States*, 273 U.S. 28, 29 (1927) ("A search prosecuted in violation of the Constitution is not made lawful by what it brings to light. . . ."); *see also Pace v. Beto*, 469 F.2d 1389, 1391 (5th Cir. 1972) ("The legitimacy of a search must be judged at its inception.").  Therefore, the Court does not engage in *post-hoc* reasoning to justify the search in this case.

AO 72A
(Rev.8/8
2)

threats or promises were made to him, and Tripps was not under the influence of drugs or alcohol nor mentally impaired.  [*Id.* at 12-13.].  The Government makes no argument that Tripps's post-*Miranda* statements are admissible.  [*See id.*, *passim*].

In response, Tripps first states that as of the date of his brief, the Government and defense counsel had not met to discuss which post-arrest statements the Government intended to introduce so that he could challenge them.  [Doc. 41 at 3].  In countering the Government's arguments about the propriety of the search of the Jetta and the seizure of physical evidence, Tripps argues that Washington did not have reasonable suspicion to detain him to await the canine sniff based because Washington's testimony about smelling marijuana is not credible because (1) Tripps did not appear to be under the influence of marijuana; (2) Washington did not see any evidence of marijuana usage in plain view; (3) Tripps was not arrested for being under the influence of marijuana; (4) Hernandez was not impaired or under the influence of marijuana; (5) McNeal did not smell marijuana despite being observed leaning inside the Jetta to speak with Hernandez; (6) Washington had very little experience in detecting marijuana smells, (7) Washington's testimony was inconsistent because (a) his initial testimony that he summoned the canine due to the odor of marijuana was contradicted by his later testimony that he called for the canine because Tripps and Hernandez refused consent

11

to search, and (b) in his written report he added as suspicious that Tripps carried a large amount of currency and Hernandez's supposedly contradictory statements about where he worked; (8) Figueroa did not document his detection of the marijuana smell; and (9) the amount of marijuana located in the vehicle could not have generated the odor claimed to detected (also a *post-hoc* reason that the Court rejects out of hand).  [Doc. 41 at 3-7].

Finally, the Court construes Tripps's alternative argument to be that, even if there was reasonable suspicion, his detention was unreasonably delayed for the canine sniff.  [*Id.* at 8-9].

In reply, the Government argues that Tripps apparently concedes that Washington had reasonable suspicion to pull him over for the traffic violation  and lawfully arrested him for DOSL, and that the dog sniff was reliable, since he did not address any of these points in his brief.  [Doc. 42 at 4].  As to Tripps's detention while awaiting Atos's arrival, the Government argues that the Supreme Court has recognized that the police may conduct an open-air sniff by a drug-detecting dog during the regular course of a lawful traffic stop but they cannot detain an individual beyond the time necessary to complete the traffic stop in the absence of reasonable suspicion of other criminal activity.  [*Id.* (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1612-14

12

AO 72A
(Rev.8/8
2)

(2015))] .  It argues that *Rodriguez* is inapplicable in this case because Tripps was not detained following a traffic stop to allow for an open-air sniff; rather, he was lawfully arrested for DOSL and cannot complain that he was detained in order to allow Atos to sniff the vehicle.  [*Id.* at 5].  Alternatively, the Government reiterates that there was reasonable suspicion to continue to detain Tripps because of Washington's detection of the smell of marijuana.  [*Id.* at 5-8].

Finally, the Government argues that Tripps abandoned his argument as to the voluntariness of his post-arrest pre-*Miranda* statements because he did not present any counter-arguments to the Government's opening brief.  [*Id.* at 2].  It argues that although Tripps argued that the lawyers had not gotten together to discuss which statements were at issue, it claims that the statements that the Government seeks to admit for impeachment were detailed in its opening brief.  [*Id.* at 4 n.1].

## III.  Discussion

### A.    The cocaine and firearm were lawfully seized

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  "In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable

cause." *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005). Evidence obtained in violation of the Fourth Amendment must be suppressed. *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir. 1991). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the Government. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citing *United States v. Impson,* 482 F.2d 197 (5th Cir. 1973)); *see also United States v. Knight*, 336 Fed. Appx. 900, 904 (11th Cir. July 8, 2009). Thus, the Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment. *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.

A so-called "*Terry* stop" is one such narrow exception. *See Terry v. Ohio*, 392 U.S. 1 (1968). *Terry*, and the cases which have followed it, make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000); *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000). Under *Terry*, police officers may make an

AO 72A
(Rev.8/8
2)

investigative stop if the circumstances are sufficient to enable them reasonably to suspect that an individual is engaged in criminal activity.  *United States v. Cortez*, 449 U.S. 411, 417-22 (1981); *Terry*, 392 U.S. at 21.  Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient.  *United States v. Powell*, 222 F.3d 913, 917-18 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-75 (11th Cir. 1996).  Specifically, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law."  *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (quoting *Navarette v. California*, 134 S. Ct. 1683, 1687-88 (2014) (internal quotation marks omitted)).

A routine traffic stop is a limited form of seizure that is more analogous to an investigative detention than a custodial arrest, and courts analyze the legality of such stops under the *Terry* standard.  *United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015); *see also United States v. Dipirro*, 649 Fed. Appx. 930, 931 n.1 (11th Cir. May 18, 2016) ("Though Defendant only references probable cause, we note that a traffic stop is 'constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with' *Terry* [ ].") (quoting *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008))

15

(citation omitted).  *Cf. Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.") (citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam)).  In this case, Washington had reasonable suspicion, if not probable cause, to stop the Jetta for an illegal U-turn in violation of O.C.G.A. § 40-6-121(4).  Tripps does not dispute the basis of the stop.

Under *Terry*, an officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)  (internal quotation marks omitted).  Moreover, " 'the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop.' "  *Holt*, 777 F.3d at 1256 (quoting *Purcell*, *id.* (internal quotation marks omitted)).  Once the police conduct a valid traffic stop, they are entitled under the decisional law to conduct a variety of checks on the driver and his car, including questioning the driver about the traffic violation, requesting consent to search the car, and running a computer check for outstanding warrants.  *See, e.g., Ohio v. Robinette*, 519 U.S. 33, 35-36 (1996) (discussing an officer's computer check of driver license and request for consent to search during a

16

traffic stop); *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (holding that an officer may prolong a traffic stop to investigate the driver's license and the vehicle registration, including by requesting a computer check, or while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation) (citing *Purcell*, 236 F.3d at 1278); *United States v. Hardy*, 855 F.2d 753, 755, 757 (11th Cir. 1988) (relating to officers' request for consent to search and check for warrants after traffic stop).  However, such activities must not prolong the traffic stop beyond a reasonable amount of time under the circumstances of the stop.  *Holt*, 777 F.3d at 1256; *Purcell*, 236 F.3d at 1279.  Although the Eleventh Circuit measures the reasonableness of a stop's duration under the totality of the circumstances, such that " '[r]igid time limitations and bright-line rules are generally inappropriate,' [the court has] approved traffic stops lasting, for example, 14 minutes and 50 minutes." *Holt*, *id.* (quoting *Purcell*, *id.* (collecting cases)).

In this case, between four and six minutes after stopping the Jetta, Washington discovered through routine computer and dispatch checks that Tripps was driving on a suspended license, thus making him subject to arrest under Georgia law, and in fact Washington placed Tripps under arrest less than ten minutes after the traffic stop was

17

initiated.  Thus, the duration of the traffic stop was reasonable and Tripps was properly arrested for DOSL.  O.C.G.A. § 40-5-121(a).

Next, the Court agrees with the Government that Tripps's arrest based on probable cause resolves the search and seizure issue in this case.  Tripps cannot complain that he was unconstitutionally detained on the ground that there was no reasonable suspicion to continue the traffic stop to await the arrival of the canine unit, because he was not being detained for that purpose; rather, he was "detained" because he was lawfully in custody following commission of the DOSL offense.  Therefore, this case is different from cases, such as *Rodriguez*, that prohibit the police from prolonging a traffic stop where the reason for the stop has been resolved, in order to perform a drug-dog sniff, and where there is no reasonable suspicion of independent criminal conduct.  In *Rodriguez*, the Court observed that  "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'– to address the traffic violation that warranted the stop and attend to related safety concerns," 135 S. Ct. at 1614, and found that a seven- or eight-minute delay between an officer completing a warning for a traffic violation and a drug-detecting canine alerting to the presence of narcotics unnecessarily lengthened the stop beyond its permissible purpose.  *Id.* at 1615-16; *see also Boyce*, 351 F.3d at 1106

18

(holding that a traffic stop "may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity" (quotation marks omitted)).   Here, on the other hand, Tripps's freedom of movement was not being restricted by any delay occasioned by Figueroa and Atos's dispatch, but rather by Tripps's lawful arrest for DOSL.   *Rodriguez* and similar cases prohibit detentions pending a canine sniff in the absence of reasonable suspicion unrelated to the completed traffic stop, a situation not presented by the facts of this case.   Since Tripps makes no other argument in challenging the search of the Jetta, his motion to suppress evidence is due to be denied.[8]

---

[8]   Although no separate argument was made as to the firearm's seizure, it also was lawfully seized since it was discovered in plain view upon Tripps's showing it to Washington, and its incriminating nature was apparent upon the discovery of the narcotics. *Horton v. California,* 496 U.S. 128, 136-37 (1990) (the plain view doctrine permits a warrantless seizure where:  (1) an officer is lawfully located in the place from which the seized object could be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the incriminating character of the item is immediately apparent); *United States v. Hromada*, 49 F.3d 685, 690 (11th Cir. 1995).

While it is true that the firearm was seized prior to the discovery of the narcotics, and thus its incriminating character was not apparent until that point, it was proper for the officers to seize the weapon initially for officer safety, since there was another civilian in the vehicle initially, and other officers and the drug-detecting canine were likely to be entering the vehicle.  *See United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010); *United States v. Hankton*, Crim. Action No. 12-1, 2016 WL 690533, at *2-3 (E.D. La. Feb. 19, 2016).

19

As a result, the undersigned **RECOMMENDS** that the Tripps's motion to suppress evidence, [Doc. 20], be **DENIED**.

### B.     Tripps's post-arrest pre-**Miranda** *statements were voluntarily obtained*

Although the Government did not identify the statements it would use to impeach Tripps by reference to the digital stamp on the DVD, it did set out the statements in its brief with enough precision to allow the Court to consider whether they were voluntarily obtained.  Further, although Tripps did not identify the reasons why these statements were not voluntary, rather than concluding that Tripps forfeited any challenge to the voluntariness of these statements, the Court analyzes the issue on the merits and Tripps can object to this recommendation to the District Judge.

The Government bears the burden of showing that a defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary.   *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475.  The Government concedes that Tripps was questioned after he was in custody and before he was *Mirandized*, and thus, his post-arrest pre-*Miranda*

statements are not admissible in the Government's case-in-chief.[9]  The Court limits its

analysis to only the post-arrest, pre-*Miranda* statements.

Separate and apart from compliance with *Miranda*, the Government also must

establish that a custodial defendant's statements were voluntary.  *United States v. Sims*,

719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government

has complied with the *Miranda* requirements.  Upon finding compliance with *Miranda*,

the court then rules on the confession's voluntariness."); *see also Jarrell v. Balkcom*,

735 F.2d 1242, 1252 & n.11 (11th Cir. 1984) (observing that although *Miranda* and

*Jackson v. Denno*, 378 U.S. 368 (1964), protect Fifth Amendment rights, *Jackson*

"raises an issue distinct from the *Miranda* question in determining a confession's

admissibility and [t]hus, even if a court finds compliance with *Miranda*, the court must

still rule on the confession's voluntariness").

---

[9]     The Government makes no argument that the post-*Miranda* statements
were obtained in compliance with *Miranda* or were otherwise voluntary and, therefore,
the Court will not discuss these statements in any detail.  The Court notes, however,
that it is doubtful that the record supports findings that Tripps even agreed to waive his
*Miranda* rights or that such waiver was made voluntarily.  Although the DVD might
reflect that upon being asked whether Tripps wanted to answer questions after
Washington recited the *Miranda* warnings he stated, "Sure," DVD at 36:54, the Court
is not persuaded that that is what he in fact stated.  More problematic is Washington's
apparent statement before Tripps arguably stated that he would answer questions that
Washington would show Tripps the drugs that were found only if he agreed to answer
questions.  DVD at 36:46.

21

In any arrest or custodial situation there is present a degree of duress. The question is whether the officers used coercive tactics or took unlawful advantage of the situation to obtain a custodial defendant's statements. *Cf. United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973)[10] (discussing consent to search following arrest). Moreover, while a defendant's mental condition is a " 'significant factor' " in the " 'voluntariness calculus,' " *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988) (quoting *Connelly*, 479 U.S. at 520), even the interrogator's knowledge that a suspect may have mental problems does not make the suspect's statement involuntary unless " '[t]he police exploited this weakness *with coercive tactics*.' " *Miller*, 853 F.2d at 1357 (quoting *Connelly*, 479 U.S. at 521 (emphasis in *Miller*)). Voluntariness of statements is analyzed similarly to voluntariness of a *Miranda* waiver. The Court should consider the totality of the circumstances in assessing whether any police conduct was "causally related" to the waiver. *See Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's waiver was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360

---

[10]      In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

AO 72A
(Rev.8/8
2)

(11th Cir. 1989).  Among the factors the Court should consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996).   However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . ."  *Gonzalez*, 71 F.3d at 828 (citations omitted).  Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.  *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

23

Here, the Court finds that the totality of the circumstances demonstrate that Tripps's post-arrest pre-*Miranda* statements were voluntary.  The record does not reveal Tripps's educational level, but he was a forklift operator and held other jobs, so the Court concludes that he had the mental capacity to make an unrestrained choice whether to make a statement or answer questions despite not being *Mirandized*.  He was lawfully arrested and searched, however, there is no evidence that the officers exercised more than minimal force against Tripps.  He was not pulled out of the vehicle, but exited upon command.  He was patted down and then more formally searched, again with minimal force.  Even after his arrest, he felt comfortable enough to plead with Washington not to take his money because he needed it to pay his bills and then to ask the officers on the scene to open the police vehicle door or allow him to sit on the curb.

Further, Tripps was not restrained for an unduly long period of time in the back of the police vehicle pending the arrival of the canine unit.  Although he complained that it was stuffy and requested more air or to sit on the curb, and was heard telling the officers that he was having trouble breathing because he had been ill (thus the reason for some of the medicines found in the grey bag), the Court notes that the encounter occurred in early January in the early evening, and thus the back of the police car would not be overly warm or stuffy.  In fact, the police retrieved Hernandez's coat from the

24

Jetta so that she could put it on, thus demonstrating some proof that the temperature was not stifling in the rear of the police car.

Moreover, there were no promises made to Tripps that would render his answering any questions subject to a *quid pro quo*.  Until the discussion over whether he would waive his *Miranda* rights, *see* n.9 *supra*, neither Washington nor any other officer with whom Tripps spoke made any promises of leniency, nor were any threats made to him.  There is no evidence that the officers in any way engaged in any deception.  Finally, the questioning was brief, limited, and somewhat intermittent.  All of these factors point to voluntariness.

Therefore, the Court concludes that Tripps's post-arrest, pre-*Miranda* statements were obtained voluntarily.  However, because Tripps was in custody and questioned without the benefit of *Miranda* warnings and the Government did not show that he validly waived his *Miranda* rights, the Court **RECOMMENDS** that Tripps's motion to suppress statements, [Doc. 34], be **GRANTED** and that the statements be excluded from the Government's case-in-chief.  However, the Court concludes that Tripps's post-arrest, pre-*Miranda* statements nonetheless were voluntarily obtained, and thus can be used for impeachment purposes should Tripps testify at trial.   *Oregon v. Hass*, 420 U.S. 714, 722-23 (1975) (holding that a substantive violation of *Miranda* does not

AO 72A
(Rev.8/8
2)

preclude a defendant's voluntary statement from being used for impeachment purposes); *Harris v. New York*, 401 U.S. 222, 224-26 (1971).

### IV.    Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant Tripps's motion to suppress evidence, [Doc. 20], be **DENIED**, and that his motion to suppress statements, [Doc. 34], be **GRANTED**, except that his post-arrest, pre-*Miranda* statements are admissible for impeachment if Tripps testifies at trial.

The undersigned has now ruled on all matters referred pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014), and has not been informed of any impediments to scheduling a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED and CERTIFIED**, this the 10th day of January, 2017.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

26